# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Yun CHAN,** ) | |
| ) | Case No.  1:25-cv-07492 |
| *Plaintiff-Petitioner,* ) | |
| ) | |
| v. ) | **VERIFIED PETITION FOR A** |
| ) | **WRIT OF HABEAS CORPUS AND** |
| **Judith ALMODOVAR**, in her official capacity as ) | **COMPLAINT** |
| Acting Field Office Director of New York, ) | |
| Immigration and Customs Enforcement; **Todd** ) | ***Oral Argument Requested*** |
| **LYONS**, in his official capacity as Acting Director ) | |
| U.S. Immigration and Customs Enforcement; **Kristi** ) | |
| **NOEM** in her official capacity as Secretary of ) | |
| Homeland Security; **Pam BONDI**, in her official ) | |
| capacity as Attorney General; **U.S. Department of** ) | |
| **Homeland Security;** and **U.S. Immigration and** ) | |
| **Customs Enforcement**, ) | |
| ) | |
| *Defendants-Respondents.* ) | |
| ) | |
| ) | |

## PRELIMINARY STATEMENT

1.      Petitioner Yun Chan, a stateless individual who was trafficked to the United States as a teenager, files this action to prevent Respondents—Officers of the United States, the U.S. Department of Homeland Security, and U.S. Immigration and Customs Enforcement—from removing him from the United States without due process of law.

2.      Mr. Chan is a 49-year-old man who has lived in the United States since his late teens. When Mr. Chan was just fourteen years old, he was trafficked from rural China (a village outside of Wenzhou, which is a port city within the Zhejiang Province of the People's Republic of China) to the United States by a so-called "Snakehead" organization, a criminal gang that transports vulnerable individuals from one country to another in exchange for money or indentured servitude.

During his arduous, yearslong journey to America, Mr. Chan—who was at the time just a teenager—witnessed another human trafficking victim die, was repeatedly sexually abused, and suffered inhumane and brutal conditions at the hands of his traffickers. Upon arrival in the United States, Mr. Chan was required to work 16-hour shifts in a factory in Queens, New York for three years.

3.     Shortly after his arrival, members of the Snakehead organization that had trafficked Mr. Chan coerced him to join their criminal organization. These individuals controlled every facet of Mr. Yun's life—his housing, food, water, and access to petty cash. While under their control, Mr. Chan was required to cook and clean for them, run errands, and generally serve at their beck and call.

4.     To keep Mr. Chan in line, the members of the Snakehead organization threatened to harm his family in China. Mr. Chan, who did not know anyone in the United States, who did not speak any English, who feared for the lives of his family members, and who had just turned 18 years old, agreed to partake in the organization's criminal activity. Soon thereafter, Mr. Yun was involved in the murder of a rival gang member, for which he ultimately served more than 23 years in prison until he was released on parole in May 2020. Since then, Mr. Chan has been a productive member of society, working multiple jobs and regularly attending church.

5.     Following his incarceration, Mr. Chan was taken into custody by Respondent Immigration and Customs Enforcement ("ICE"). On November 13, 2020, Mr. Chan was released by ICE subject to an Order of Supervision ("OSUP"). An OSUP, in essence, outlines instructions that an individual must follow when released from ICE custody. Typically, people who are subject to an OSUP are considered low-risk individuals and are unable to be removed from the United States for a variety of potential reasons.

2

6.    Despite the absence of any change in circumstances since his November 13, 2020 release, Mr. Chan was re-detained today, September 9, 2025, when he appeared, as instructed, for a regularly scheduled check-in and despite his full and complete compliance with the terms of the OSUP.  As discussed *infra*, because Mr. Chan was granted an OSUP, the Government *necessarily* determined he is neither a flight risk nor a danger to the community.

7.    ICE's notice for the September 2025 OSUP check-in did not state that Petitioner's OSUP would be revoked, nor did it inform Mr. Chan that he would be detained and processed for an expedited and unnoticed deportation.  Yet that is precisely what occurred.  Shortly after Mr. Chan—who was accompanied by Kate Mogulescu, a professor at Brooklyn Law School—arrived for his scheduled check-in, he was ushered into a screening area where Officer De La Cruz asked him three questions, which Mr. Chan answered truthfully:

    **(1)** Do you have a criminal conviction? (Yes)

    **(2)** Do you have any applications or petitions pending? (No) and

    **(3)** Are you subject to an order of deportation? (Yes)

8.    Officer De La Cruz then wrote "CRIM" on Mr. Chan's intake papers and ushered Mr. Chan to the next room, where Officer Melo asked a few additional questions.  Soon thereafter, Mr. Chan was informed that he was going to be detained because of his "criminality" and final order of deportation.

9.    Professor Mogulescu asked the officers for an explanation of the legal basis for Mr. Chan's detention.  She explained that he had an OSUP, and she requested that a supervisor provide a further explanation.  Eventually Assistant Field Office Director Robinson informed Professor Mogulescu of the purported "change in circumstance" that permitted ICE to detain

Mr. Chan, notwithstanding his OSUP and lack of due process:  that "China is now issuing travel documents."  It was—and continues to be—unclear what, if anything, this means.

10.    Despite ICE's assertion from earlier today, Mr. Chan has been unable to obtain a Chinese passport.  At the direction of ICE on March 23, 2023, Mr. Chan previously tried to obtain a passport through the Consulate General of the People's Republic of China in New York, but he was advised that he needed to complete a form online.  Mr. Chan went to the website (and then the Chinese Consular Affairs mobile application), but the form required him to provide a Chinese identification number.  Because Mr. Chan was the fourth-born son, his parents never reported his birth to the Chinese government, which at the time limited how many children a family could have.  Accordingly, Mr. Chan did not have the requisite identification number, and he could not complete his application for a passport.  Mr. Chan relayed this information to ICE on April 4, 2023, at his next scheduled check-in, including through a sworn affidavit from a Mandarin-speaking paralegal.  Fully apprised of Mr. Chan's stateless status, ICE scheduled Mr. Chan for a check-in on September 9, 2025, at which it detained him.

11.    The power of the Government to detain and deport immigrants is not without limitation.  To the contrary, its power is delineated by a specific set of statutes and regulations, and subject to the limitations of the United States Constitution.  To the extent that Respondents revoked Mr. Chan's OSUP without prior notice or opportunity to be heard, Respondents have acted in violation of statutes, regulations, and the United States Constitution.  *See Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137,  2025 WL 1284720 at *1 (W.D.N.Y. 2025) ("As the framers recognized centuries ago, fair process—not just the correct outcome—matters.  After all, without due process, there is no way to tell whether the result is in fact correct."); *Rombot v. Souza,* 296 F. Supp. 3d 383, 389 (D. Mass. 2017) (finding that "[t]he Supreme Court has recognized that an 'alien may no doubt be returned

4

to custody upon a violation of [supervision] conditions,' but it has never given ICE *carte blanche* to re-incarcerate someone without basic due process protection.") (citing *Zadvydas v. Davis*, 533 U.S. 678, 700 (2001); *see also Torres-Jurado v. Biden,* 2023 U.S. Dist. LEXIS 193725 at *12 (S.D.N.Y. Oct. 29, 2023) (stating that "due process, at a minimum" requires the government to afford meaningful notice and an opportunity to be heard and that the opportunity must be meaningful) (citing *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 403 (S.D.N.Y. 2004)).

12.     Here, despite no changed circumstances regarding either flight risk or public safety, ICE nevertheless detained Mr. Chan without notice, a hearing, or even an interview.  The Government's arbitrary conduct is contrary to due process.

13.     Mr. Chan seeks this Court's intervention to order his immediate release and for a limited, protective order in the form of a temporary restraining order and/or preliminary injunction to ensure that Petitioner is not removed from this District.  If this limited relief is not granted, Mr. Chan will be deported, perhaps to China or another country.

## PARTIES

14.     Mr. Chan is a 49-year-old man who has lived in the United States since he was trafficked to this country as a teenager.  Prior to his unnoticed detention by ICE on September 9, 2025, that took place at 26 Federal Plaza, New York, NY 10278, Mr. Chan resides at 127-08 25th Avenue, College Point, New York 11356.

15.     Respondent Judith Almodovar is named in her official capacity as the acting Officer Director  of ICE's New York Field Office within the United States Department of Homeland Security ("DHS").  In this capacity, she is responsible for the administration of immigration laws and the execution of detention and removal determinations and is legal custodian of Petitioner. Respondent Francis's address is 26 Federal Plaza, 9th Floor, New York, New York 10278.

16.     Respondent Todd Lyons is named in his official capacity as Acting Director of ICE.

17.     Respondent Kristi Noem is named in her official capacity as the Secretary of DHS.  In this capacity, she is responsible for overseeing ICE's day-to-day operations and leading approximately 20,000 ICE employees, including Respondent Francis.

18.     Respondent Pam Bondi is named in her official capacity as the United States Attorney General.

19.     Respondent DHS is an executive department of the United States Government headquartered in Washington, D.C.  DHS is the parent agency of ICE.

20.     Respondent ICE is a component agency of DHS and is responsible for enforcing federal immigration law, including the detention and removal of immigrants.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction under the U.S. Constitution.  U.S. Const. art. I § 9, cl. 2 ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require.").  This Court also has jurisdiction under 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), the Immigration and Nationality Act ("INA") and regulations thereunder; the Fifth Amendment to the United States Constitution; and the Administrative Procedure Act ("APA"), 5 U.S.C § 701.

22.     Petitioner's current arrest and detention constitutes a "severe restraint" on his individual liberty such that Petitioner is "in custody" of Respondents in violation of the laws of the United States.  *See Hensley v. Municipal Court*, 411 U.S. 345, 351 (1973); 28 U.S.C. § 2241.

23.     This Court also has jurisdiction under 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1361 (mandamus).

24.     The Court may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. § 702, and 28 U.S.C. § 1361.

25.     Venue is proper in the U.S. District Court for the Southern District of New York because Mr. Chan was detained within this District on September 9, 2025, and upon information and belief, remains in this District.  *See* 28 U.S.C. § 1391(e).

26.     Venue is also proper because, upon information and belief, Respondent Francis is present in this District.

## RELEVANT STATEMENT OF FACTS AND PROCEDURAL HISTORY

### Early Life in China

27.     Yun Chan was born on June 17, 1976, in the Zhejiang Province of the People's Republic of China.  Mr. Chan was raised in a village outside of Wenzhou, which is a port city within the Zhejiang Province.  His family was located in a rural area and had no electricity or paved roads.

28.     Mr. Chan's parents had three other sons.  At the time, China had a one-child policy. Because Mr. Chan was the fourth-born child, his birth was never reported to the Chinese government, and he therefore has no official documentation showing that he was born, or ever lived, in China.

29.     In or around the Summer of 1990, when Mr. Chan was 14 years old, a human trafficker visited Mr. Chan's home and spoke with Mr. Chan's parents.  The man was a member of a "Snakehead" organization, which is a group that illegally traffics people to the United States.  This organization, like other Snakehead organizations at the time, charged $35,000 to smuggle one individual to the United States.  If a family did not have the money up front—which Mr. Chan's family did not—the person taken to the United States was required to work for the Snakehead organization for three years to pay off the debt.

7

30.    Mr. Chan's parents decided to send Mr. Chan to the United States.  A few days after the man visited the Chan residence (which was a small shanty made of wood, grass, and dirt), Mr. Chan packed a small bag of clothes, and dropped him at a bus stop.  His journey to the United States had begun.

**Journey to the United States**

31.    Mr. Chan's parents told him that the bus—the first vehicle Mr. Chan ever rode in—would take him to the airport, where he would board a plan to the United States.  But Mr. Chan first realized that something was not right when a trafficker ordered the 20-or-so passengers to sneak from the bus to an army truck.  From there, the conditions on what turned out to be a yearslong journey worsened.

32.    Food and water were scarce.  The group often only ate once per day, and there were days when the group was given no food at all.  Mr. Chan often had to drink from puddles or rivers.  There was no shelter.  The group was forced to sleep outside on the ground with no blankets or pillows.  Other than rinsing themselves in rivers, the group never bathed.

33.    On one occasion, several smaller groups that were being trafficked were climbing a mountain.  Mr. Chan observed someone from a different group fall off the mountain.  When the various groups were later reunited, those being trafficked confirmed that the person who had fallen from the mountain had died.  Mr. Chan witnessed people grow ill on the journey, some of whom also died.

34.    At some point, the group entered Thailand, where for the first time in more than two years Mr. Chan lived indoors, in a crowded apartment.  Mr. Chan was housed in Bangkok for more than a year.  There were roughly 30 to 40 men and women living in the apartment, and Mr. Chan slept

on the floor, surrounded by strangers.  There was one kitchen and one bathroom, and fights often broke out as people grew impatient with the length of their journeys.

35.    From time to time, the traffickers would call individuals' names and take them out of the apartment.  Most often, those who left would not return.  Mr. Chan presumed that those who were called were taken to the United States.  On one occasion, Mr. Chan, who was around 16 years old at the time, was called to leave the apartment.  He was brought to a hotel room where one of the female traffickers was staying.  This middle-aged woman demanded that Mr. Chan have sex with her.  After taking Mr. Chan's virginity, she beat Mr. Chan.  From then on, this woman would occasionally remove Mr. Chan from the apartment and force him to perform sex acts on her.

36.    Finally, in March 1994, the traffickers took Mr. Chan to the Bangkok airport and gave him false documentation.  Mr. Chan, then just 17 years old, landed at Newark Airport in New Jersey on March 28, 1994.

37.    When Mr. Chan arrived in the United States, he had no money, knew no one in the United States, and spoke no English.  From the moment he arrived, Mr. Chan's life was controlled by the Snakehead organization.  After going through Customs, Mr. Chan was picked up by two men, who drove Mr. Chan to an apartment in what he later learned was Brooklyn.  After a few days at that apartment, Mr. Chan was ushered into a car and taken to another location in Queens.

38.    Once in Queens, Mr. Chan's life continued to be run by the Snakehead organization, just as it had been since he was 14 years old.  To pay off his $35,000 debt, Mr. Chan was forced to work grueling hours in a clothing sweatshop in Flushing.  He would arrive at the sweatshop by 6 am and work until 10 pm—16 hours straight, six days a week.  The work was menial and difficult.  Yun did not receive any money for his work; instead, the traffickers kept any money Yun had earned and provided him with meager food and shelter.

39.    One day, members of the Snakehead organization took Mr. Yun to an expensive dinner, which, in hindsight, Mr. Chan realizes was used to coerce him to join their criminal activity. These men were all older than Mr. Chan, who was just a teenager at the time. The dinner was the first time Mr. Chan ever ate in a restaurant.

40.    After the dinner, the group began giving Mr. Chan orders. Mr. Chan—who had just completed a challenging journey through Southeast Asia during which he had not spoken to or heard from anyone in his family for nearly four years—had nowhere to turn or hide. The group preyed on this vulnerability. When they instructed Mr. Chan to no longer report to the factory, he complied with their demands.

41.    The gang exercised control over Mr. Chan. They constantly reminded him that he owed them $35,000. They remained Mr. Chan's only source of food, clothing, and shelter in a foreign country where he knew no one. The leader of the group once threatened Mr. Chan. He said that he knew where Mr. Chan's family lived in China and threatened to murder his family if he tried to run away. Without any other contacts in the United States or money of his own, Mr. Chan continued to associate with the group.

42.    Mr. Chan cooked and cleaned for the group; he ran to the store to get them food and drinks; and he served at their beck and call. They gave him a beeper and demanded that he call them immediately after they paged him. And the group's requirements soon became more dangerous. For example, Mr. Chan and the other subordinates were instructed to go to the airport to pick up new people from China, much in the same way he had been picked up when he first arrived at Newark Airport. Mr. Chan was also ordered to go to sweatshops in Queens and pick up envelopes. Mr. Chan later came to realize that those sealed envelopes contained protection money that the

organization had extorted from the business owners, and he was, in fact, ultimately convicted of extortion.

43.    The demands of Mr. Chan escalated quickly.  Within months of Mr. Chan arriving in the United States, the gang had demanded that Mr. Chan help to rob—and ultimately kill—a rival trafficker.  Mr. Chan was convicted of murder, and on January 14, 1997, the Court sentenced him to imprisonment for a term 25-years-to-life, with the possibility of parole.

44.    While incarcerated, Mr. Chan turned his life around.  Starting around 2014, Mr. Chan had embraced Christianity, which helped Mr. Chan connect with his prison community.  He found his mental health and happiness improving through daily prayer.

45.    Mr. Chan was granted parole and released from prison on May 23, 2020.  Upon release, Mr. Chan was taken to the Immigration Customs Enforcement ("ICE") Detention Center in Denver, Colorado, where he was housed until November 13, 2020.  At that time, he was granted an OSUP.

46.    Following his release from ICE custody, Mr. Chan worked with immigration lawyers to attempt to obtain Chinese identification.  China, however, refused to recognize Mr. Chan as a Chinese citizen because he was never registered in the Chinese system.  Since returning to New York, Mr. Chan has had regular in-person check-ins with ICE, including on January 20, 2021, March 22, 2022, March 23, 2023, April 4, 2023, April 4, 2024, September 9, 2024, and December 4, 2024.

47.    On March 23, 2023, Mr. Chan attended his regular ICE check-in meeting.  During the meeting, an ICE officer asked him for his Chinese passport.  Mr. Chan explained that he does not have a Chinese passport or any other identification from the Chinese government, such as a birth certificate.  The officer required that Mr. Chan submit a completed Chinese passport application

to the ICE office by April 4, 2023 and warned Mr. Chan that if he did not comply, ICE would require Mr. Chan to wear an ankle monitor and check-in at the office every day at 8 am.

48.     Mr. Chan visited the Chinese Consulate General on March 27, 2023 to request a passport application, but he was informed that all applications must be submitted online through the "China Consular Affairs" app.  Mr. Chan was unable to submit an application through the app because the "name verification step" required him to provide a Chinese identification number to verify his Chinese citizenship, which Mr. Chan does not have.  Mr. Chan relayed this information to an ICE officer on April 4, 2024, and his next check-in was scheduled.  All the while, Mr. Chan continued to lead a lawful life, working jobs in construction and at a restaurant.

49.      On September 8, 2025, Mr. Chan arrived at ICE's New York Field Office located at 26 Federal Plaza, New York, NY 10278 before 9:00 am.  After nearly three hours of waiting, Mr. Chan was instructed to return the following day to complete his check-in.  As always, Mr. Chan complied with the directives of ICE officers, and on September 9, 2025, he returned, accompanied by Professor Mogulescu of Brooklyn Law School.

50.     As noted above, ICE's notice for the September 2025 OSUP check-in did not state that Mr. Chan's OSUP would be revoked, nor did it inform Mr. Chan that he would be detained and processed for an expedited and unnoticed deportation.  Yet that is precisely what occurred.  Shortly after Mr. Chan arrived for his scheduled check-in, he was ushered into a screening area where Officer De La Cruz asked him three questions:

   **(1)** Do you have a criminal conviction?

   **(2)** Do you have any applications or petitions pending? and

   **(3)** Are you subject to an order of deportation?

51.     Mr. Chan answered these questions honestly, stating that he has a criminal conviction, does not have any applications or petitions pending, and is subject to an order of deportation.  Officer De La Cruz wrote "CRIM" on Mr. Chan's intake papers and ushered Mr. Chan to the next room, where Officer Melo asked a few additional questions.  Soon thereafter, Mr. Chan was informed that he was going to be detained because of his "criminality" and final order of deportation.

52.     Professor Mogulescu asked the officers for additional information about why Mr. Chan was being detained.  She explained that he had an OSUP, and she requested that a supervisor provide a further explanation.  Eventually Assistant Director Robinson informed Professor Mogulescu of the purported "change in circumstance" that permitted ICE to detain Mr. Chan, notwithstanding his OSUP and lack of due process:  that "China is now issuing travel documents."  It was—and continues to be—unclear what, if anything, this means.

53.     Indeed, as indicated above, Mr. Chan has been unable to obtain a Chinese passport.  In fact, at the direction of ICE on March 23, 2023, Mr. Chan previously tried to obtain a passport through the Consulate General of the People's Republic of China in New York to request an application, but he was advised that he needed to complete a form online.  Mr. Chan went to the website (and then the Chinese Consular Affairs mobile application), but the form required him to provide a Chinese identification number.  Because Mr. Chan was the fourth-born son, his parents never reported his birth to the Chinese government, which at the time limited how many children a family could have.  Accordingly, Mr. Chan did not have the requisite identification number, and he could not complete his application for a passport.  Mr. Chan relayed this information to ICE on April 4, 2023, at his next scheduled check-in, including by submitting a sworn affidavit from a Mandarin-speaking paralegal.  Fully apprised of Mr. Chan's stateless status, ICE scheduled Mr. Chan for a check-in on September 9, 2025, at which it detained him.

## LEGAL FRAMEWORK

**Mr. Chan's Due Process, Statutory, and Regulatory Rights to Release from Detention and Unlawful Re-Detention.**

54.     Respondents' purported basis for re-detaining Mr. Chan is 8 U.S.C. §1231.  ICE's authority to release people from detention is governed by 8 U.S.C. § 1231(a)(3), which grants ICE authority to release an individual "subject to supervision."

55.     Federal regulations specify that ICE may only release such individuals if they "demonstrate[] to the satisfaction of the Attorney General . . . that his or her release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight pending such alien's removal."  8 C.F.R. § 241.4(d); *see also id*. § 241.4(e)(6).   These requirements—flight risk and danger—memorialize what the Constitution requires.  *See Zadvydas,* 533 U.S. at 690-91.

56.     Mr. Chan, having been released on an OSUP pursuant Section 241.4, was deemed by Respondents to not pose a flight risk or be dangerous.

57.     To comport with due process, detention must bear a reasonable relationship to its two constitutionally-authorized purposes—to ensure the appearance of noncitizens at future hearings and to prevent danger to the community.  *Zadvydas*, 533 U.S. at 690-91 (2001).

58.     ICE determined that Mr. Chan is neither a flight risk nor a danger when they granted him an OSUP on November 13, 2020.  Since that date, Respondent's circumstances have not changed, and he remains in full and complete compliance with the OSUP.

59.     The Due Process Clause of the Fifth Amendment constrains governmental decisions that deprive individuals of property or liberty.  Because Mr. Chan's detention on September 9, 2025 lacked the procedural protections that such a significant deprivation of liberty requires under the Due Process Clause, his continued detention is unlawful.  *See Mathews v. Eldridge*, 424 U.S. 319,

332 (1976); *see also Perry v. Sindermann*, 408 U.S. 593, 601-03 (1972) (reliance on informal policies and practices may establish a legitimate claim of entitlement to a constitutionally protected interest).

60.     Mr. Chan disputes any claim by the Government that he is removable.  But the revocation of Mr. Chan's release based solely on the Government's desire to remove him does not satisfy the minimum requirements of due process, because that revocation is not the product of any individualized review and alleges no relevant change in circumstances altering the original assessment of his risk of flight.  *See Ceesay*, 781 F. Supp. 3d 137,  2025 WL 1284720; *Rombot*, 296 F. Supp. 3d at 388; *Torres-Jurado*, 2023 U.S. Dist. LEXIS 193725.

61.     The Government's presumed basis for re-detaining Mr. Chan is 8 U.S.C. § 1231, the statute governing detention following a final order of removal ("post-order detention").  Under the terms of this statute and the governing regulations, Mr. Chan's detention is unlawful.

62.     The INA specifies circumstances upon which a person may be released from custody, and it does not generally provide for re-detention except for a violation of those terms.  The relevant regulatory framework (8 C.F.R. §§ 241.4(l) and 241.13(i)) authorizes revocation of an individual's release on an OSUP only in certain contexts.  Section 241.4(l) specifies revocation may occur upon violation of the conditions of release or when, in the district director's opinion, revocation is in the public interest because one of four conditions is met: "(1) the purposes of release have been served; (2) the alien violates any condition of release; (3) it is appropriate to enforce a removal order or to commence removal proceedings against an alien; or (4) the conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate."  8 C.F.R. § 241.4(l)(2).  Section 241.13(i) provides further conditions where release decisions may be revoked, only for the purpose of removal.  Notably, several of these provisions are found only in the regulations and not

the statute and are *ultra-vires*.  But even to the extent they apply, Respondents have failed to comply with the process.

63.    8 U.S.C. § 1231 authorizes the detention of individuals following a final order of removal only under specifically delineated circumstances.  The third subclause of 8 U.S.C. § 1231(a)(3) provides that an individual who is not removed within a 90-day statutory removal period "*shall* be subject to supervision" (emphasis added) under specific terms, including requirements that he or she appear periodically before an immigration officer and obey any written restrictions.  *See also* 8 C.F.R. § 241.5 (specific conditions for release—involving but not limited to reporting requirements and travel document acquisition requirements—should an order of supervision be issued).

64.    Mr. Chan has, at minimum, a regulatory right to a detailed explanation of the reasons for revocation as well as an interview to contest the basis for the revocation.  At a minimum, ICE "has the duty to follow its own federal regulations."  *Haoud v. Ashcroft*, 350 F.3d 201, 205 (1st Cir. 2003) (quoting *Nelson v. I.N.S.*, 232 F.3d 258, 262 (1st Cir. 2000)).  It has failed to do so here.

65.    When the Government fails to comply with its own federal regulations, as it did when it revoked Mr. Chan's release in violation of its own procedures, the action is invalid.  *See Rombot*, 296 F. Supp. 3d at 388.

66.    Moreover, under the APA, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review."  5 U.S.C. § 704.  The reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence."  5 U.S.C. §§ 706(2)(A), (E).

67.    The detention of Mr. Chan, who had previously been released on an OSUP, and neither violated nor failed to comply with the OSUP, is "arbitrary, capricious, an abuse of discretion and not in accordance with the law."  5 U.S.C. §§ 706(2)(A), (E).

68.    Absent this Court's intervention, Mr. Chan does not have any remedy to challenge the Respondents' decision.  *See Torres-Jurado,* 2023 U.S. Dist. LEXIS 193725 at *14 (finding that "[a]lthough procedural requirements can seem like a mere formality, they promote 'agency accountability' and ensure that the parties—and where relevant, the public—can respond fully and in a timely manner to an agency's exercise of authority.") (citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23, 140 S. Ct. 1891, 1909 (2020)).

## CLAIMS FOR RELIEF

### COUNT I:

### MR. CHAN'S DETENTION VIOLATES THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE BECAUSE IT BEARS NO REASONABLE RELATIONSHIP TO ANY LEGITIMATE PURPOSE

69.    Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

70.    To comport with due process, detention must bear a reasonable relationship to its two constitutionally-permissible purposes—to ensure the appearance of noncitizens at future hearings and to prevent danger to the community pending the completion of removal.  *Zadvydas*, 533 U.S. at 690-91.

71.    Petitioner is neither a danger nor a flight risk.  The detention of Petitioner is arbitrary on its face.

72.    Mr. Chan has dutifully and fully complied with every condition of his OSUP and no change in circumstances exists to warrant the revocation of his OSUP.

73.     Because Petitioner's detention has been unaccompanied by the procedural protections that such a significant deprivation of liberty requires under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, his continued detention is unlawful.

## COUNT II:

### MS. CHAN'S DETENTION VIOLATES THE INA, REGULATIONS THEREUNDER, AND THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE BECAUSE HE HAS BEEN RELEASED ON A VALID ORDER OF SUPERVISION

74.     Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

75.     Respondents' presumed basis for re-detaining Petitioner is 8 U.S.C. § 1231, the statute governing detention following a final order of removal ("post-order detention").

76.     Under the terms of this statute and the governing regulations, Petitioner's detention is unlawful.

## COUNT III:

### MR. CHAN'S RE-DETENTION BY RESPONDENTS VIOLATES THE APA AND THE *ACCARDI* DOCTRINE

77.     Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

78.     The APA provides that a court "shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  When the Government has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes, such that the agencies are bound to follow their own "existing valid regulations."  *United States ex rel. Accardi Shaugnessy*, 347 U.S. 260, 266, 268 (1954).  The *Accardi* doctrine also obligates agencies to comply with procedures its internal procedures.  *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974)

18

(finding that an agency is obligated to comply with procedural rules outlined in its internal manual).

79.    Because Respondents have revoked Mr. Chan's OSUP without notice or an opportunity to be heard, they violated the statute and the applicable regulations—8 C.F.R. §§ 241.4(l) and 241.13(i)—by failing to provide him with: (i) a particularized notice of the reason(s) of the revocation of his release or (ii) an opportunity to respond to the allegations contained therein.

80.    Mr. Chan has no adequate remedy at law.

## COUNT IV:

## MR. CHAN'S RE-DETENTION BY RESPONDENTS VIOLATES THE APA, 5 U.S.C. § 706(2)

81.    Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

82.    The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

83.    Respondents' re-detention of Mr. Chan who was in full and complete compliance with his OSUP was arbitrary and capricious.  On information and belief, Respondents will be unable to articulate a reasoned explanation for their decision in light of all available evidence.

84.    A court reviewing agency action "must assess … whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment; it must "examine[e] the reasons for agency decisions- or, as the case may be, the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (quotations omitted).

85.    Mr. Chan has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Chan requests that this Court:

a.    Exercise jurisdiction over this matter;

b.    Enjoin Respondents from moving Mr. Chan outside the jurisdiction of this Court and the United States pending its adjudication of this petition;

c.    Order Mr. Chan's release from ICE custody;

d.    Declare that Mr. Chan's detention violates the INA, regulations and the Due Process Clause of the Fifth Amendment;

e.    Award Petitioner costs and reasonable attorneys' fees; and

f.    Order such other relief as this Court may deem just and proper.


Dated: September 9, 2025             Respectfully submitted,
        New York, New York
                                     **PILLSBURY WINTHROP SHAW PITTMAN LLP**

                                     By: */s/ David Oliwenstein*
                                         David Oliwenstein
                                         Andrew Wiktor
                                         Catherine Perez
                                         Fangwei Wang
                                         31 West 52nd Street
                                         New York, NY 10019-6131
                                         Tel.: (212) 858-1000
                                         Fax.: (212) 858-1500
                                         david.oliwenstein@pillsburylaw.com
                                         andrew.wiktor@pillsburylaw.com
                                         catherine.perez@pillsburylaw.com
                                         fangwei.wang@pillsburylaw.com

                                     *Attorneys for Plaintiff-Petitioner Yun Chan*

## 28 U.S.C. § 2242 VERIFICATION STATEMENT

I am submitting this verification on behalf of the Petitioner because I am one of Petitioner's attorneys. I have discussed with Petitioner the events described in this Petition and Complaint. On the basis of those discussions, I hereby verify that the statements made in this Petition and Complaint are true and correct to the best of my knowledge.

Dated: September 9, 2025
       New York, New York

Respectfully submitted,

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By: _____
David Oliwenstein
Andrew Wiktor
Catherine Perez
Fangwei Wang
31 West 52nd Street
New York, NY 10019-6131
Tel.: (212) 858-1000
Fax.: (212) 858-1500
david.oliwenstein@pillsburylaw.com
andrew.wiktor@pillsburylaw.com
catherine.perez@pillsburylaw.com
fangwei.wang@pillsburylaw.com

*Attorneys for Plaintiff-Petitioner Yun Chan*