## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**Yun CHAN,**

      *Plaintiff-Petitioner,*

v.

**Judith ALMODOVAR**, in her official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; **Todd LYONS**, in his official capacity as Acting Director U.S. Immigration and Customs Enforcement; **Kristi NOEM** in her official capacity as Secretary of Homeland Security; **Pam BONDI**, in her official capacity as Attorney General; **U.S. Department of Homeland Security;** and **U.S. Immigration and Customs Enforcement,**

      *Defendants-Respondents.*

Case No. 1:25-cv-07492

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

David Oliwenstein
Andrew Wiktor
Catherine Perez
Fangwei Wang

31 West 52nd Street
New York, NY 10019-6131
Tel.: (212) 858-1000
Fax.: (212) 858-1500

*Attorneys for Plaintiff-Petitioner Yun Chan*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

NOTICE TO RESPONDENTS-DEFENDANTS................................................................ 1

RELEVANT STATEMENT OF FACTS ......................................................................... 2

ARGUMENT ................................................................................................................... 8

1. MR. CHAN IS LIKELY TO SUCCEED ON THE MERITS................................... 10

2. MR. CHAN WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A
   TEMPORARY RESTRAINING ORDER. ............................................................... 14

3. THE EQUITIES HEAVILY FAVOR MR. CHAN. ................................................. 16

4. A TRO WOULD NOT MEANINGFULLY HARM THE GOVERNMENT OR PUBLIC
   INTEREST. ............................................................................................................. 16

CONCLUSION................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*AFL-CIO v. New York Shipping Ass'n, Inc.*,
  965 F.2d 1224 (2d Cir. 1992) ................................................................. 9

*In re Baldwin-United Corp.*,
  770 F.2d 328 (2d Cir.1985) ................................................................. 9

*Brenntag Int'l Chems., Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 1999) ................................................................. 14

*Brownback v. King*,
  592 U.S. 209 (2021) ................................................................. 8

*Ceesay v. Kurzdorfer*,
  781 F. Supp. 3d 137, 2025 WL 1284720 (W.D.N.Y. May 2, 2025) .................................. 11, 14

*Conn. Dep't of Envtl. Prot. V. O.S.H.A.*,
  356 F.3d 226 (2d Cir. 2004) ................................................................. 15

*Faiveley Transport Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009) ................................................................. 14

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005) ................................................................. 14

*Garcia-Izquierdo v. Gartner*,
  No. 04 CIV. 7377, 2004 WL 2093515 (S.D.N.Y. Sept. 17, 2004) ........................... 9

*Geller v. De Blasio*,
  613 F. Supp. 3d 742 (S.D.N.Y. 2020) ................................................................. 8

*Haoud v. Ashcroft*,
  350 F.3d 201 (1st Cir. 2003) ................................................................. 13

*United States v. Int'l Bd. of Teamsters*,
  907 F.2d 277 (2d Cir.1990) ................................................................. 9

*Jolly v. Coughlin*,
  76 F.3d 468 (2d Cir. 1996) ................................................................. 15

*M.K. v. Joyce*,
  No. 25-CV-1935, 2025 WL 750599 (S.D.N.Y. Mar. 10, 2025) ........................... 9

*Mahdawi v. Trump*,
No. 2:25-CV-00389, 2025 WL 1099021 (D. Vt. Apr. 14, 2025)............................................. 9

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ...............................................................................................10, 11

*Nelson v. I.N.S.*,
232 F.3d 258 (1st Cir. 2000) ...................................................................................... 13

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................................... 16

*Ozturk v. Hyde*,
No. 25-CV-10695, 2025 WL 942731 (D. Mass. Mar. 28, 2025) .................................. 8

*Ozturk v. Hyde*,
No. 25-cv-10965, slip op. (D. Mass Mar. 25, 2025) .................................................... 8

*Perry v. Sindermann*,
408 U.S. (1972) .............................................................................................. 10, 11, 13

*Rombot v. Souza*,
296 F. Supp. 3d 383 (D. Mass. 2017) ...................................................................12, 14

*United States v. Ruiz*,
536 U.S. 622 (2002) ...................................................................................................... 8

*S.N.C. v. Sessions*,
325 F. Supp. 3d 401 ..................................................................................................... 17

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) .......................................................................................... 14

*Sheehan v. Purolator Courier Corp.*,
676 F.2d 877 (2d Cir. 1981) .......................................................................................... 9

*United States v. Shipp*,
203 U.S. 563 (1906) ...................................................................................................... 8

*Suri v. Trump*,
No. 1:25-CV-480, 2025 WL 914757 (E.D. Va. Mar. 20, 2025) ................................... 9

*Torres-Jurado v. Biden*,
2023 U.S. Dist. LEXIS 193725 (S.D.N.Y. Oct. 29, 2023) .......................................12, 14

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*,
523 F. Supp. 2d 328 (S.D.N.Y. 2007) .......................................................................... 9

*United States v. United Mine Workers of Am.*,
    330 U.S. 258 (1947) ............................................................................................... 8

*Ying Fong v. Ashcroft*,
    317 F. Supp. 2d 398 (S.D.N.Y. 2004) ............................................................. 12, 14

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ................................................................................... 10, 12, 14

Constitution

United States Constitution
    Fifth Amendment ......................................................................................... 10, 13, 15

Statutes and Codes

United States Code
    Title 5, Section 704 ............................................................................................... 12
    Title 5, Section 706(2)(A) ...................................................................................... 12
    Title 5, Section 706(2)(E) ...................................................................................... 12
    Title 8, Section 1231 ............................................................................................. 11
    Title 8, Section 1231(a)(3) ..................................................................................... 11
    Title 8, Section 1231(a)(7) ..................................................................................... 11
    Title 28, Section 1651 ......................................................................................... 8, 9

Rules and Regulations

Code of Federal Regulations
    Title 8, Section 241.4(l) ............................................................................. 11, 12, 13
    Title 8, Section 241.4(l)(2) ..................................................................................... 13
    Title 8, Section 241.5 ............................................................................................ 11
    Title 8, Section 241.5(c) ........................................................................................ 11
    Title 8, Section 241.13(i) ........................................................................... 11, 12, 13

Federal Rules of Civil Procedure
    Rule 65 .................................................................................................................... 8

## PRELIMINARY STATEMENT[1]

Petitioner Yun Chan, a stateless individual who was human trafficked to the United States as a teenager, is currently being unlawfully detained by U.S. Immigration and Customs Enforcement ("ICE"). Mr. Chan intends to contest his removal on the merits. To ensure that Mr. Chan is afforded his constitutional right to due process, Petitioner respectfully requests that the Court grant his application for a temporary restraining order preventing the Government from transporting Mr. Chan out of the Southern District of New York, which would effectively deprive this Court of jurisdiction. Because Mr. Chan satisfies the standard for temporary relief—he is likely to succeed on the merits, he will suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in his favor, and an injunction is in the public interest—Petitioner respectfully requests that the Court issue an order to maintain the status quo. Absent immediate judicial intervention, Mr. Chan faces imminent deportation, which would deprive him of his statutory and constitutional rights, as well as sever him from his community.

## NOTICE TO RESPONDENTS-DEFENDANTS

Undersigned counsel contacted the United States Attorney's Office for the Southern District of New York by email on September 9, 2025, provided notice that a Petition was filed on September 9, 2025, and provided the Petition. *See* Wiktor Declaration, Exhibit 1. Undersigned counsel also advised the U.S. Attorney's Office for the Southern District of New York that this application seeking preliminary relief would be filed. *Id.* Undersigned counsel affirms he intends to send, via email, a copy of the Petition, motion and this memorandum of law, and a proposed order granting the TRO to the U.S. Attorney's Office for the Southern District of New York upon the filing of this motion.

---

[1] All facts contained herein are drawn from the allegations in Mr. Chan's Verified Petition for a Writ of *Habeas Corpus* and Complaint.

## RELEVANT STATEMENT OF FACTS

Yun Chan was born on June 17, 1976, in the Zhejiang Province of the People's Republic of China.  Mr. Chan was raised in a village outside of Wenzhou, which is a port city within the Zhejiang Province.  His family was located in a rural area and had no electricity or paved roads.  Mr. Chan's parents had three other sons.  At the time, China had a one-child policy.  Because Mr. Chan was the fourth-born child, his birth was never reported to the Chinese government, and he therefore has no official documentation showing that he was born, or ever lived, in China.

In or around the Summer of 1990, when Mr. Chan was 14 years old, a human trafficker visited Mr. Chan's home and spoke with Mr. Chan's parents.  The man was a member of a "Snakehead" organization, which is a group that illegally traffics people to the United States.  This organization, like other Snakehead organizations at the time, charged $35,000 to smuggle one individual to the United States.  If a family did not have the money up front—which Mr. Chan's family did not—the person taken to the United States was required to work for the Snakehead organization for three years to pay off the debt.

Mr. Chan's parents decided to send Mr. Chan to the United States.  A few days after the man visited the Chan residence (which was a small shanty made of wood, grass, and dirt), Mr. Chan packed a small bag of clothes, and dropped him at a bus stop.  His journey to the United States had begun.  Mr. Chan's parents told him that the bus—the first vehicle Mr. Chan ever rode in—would take him to the airport, where he would board a plan to the United States.  But Mr. Chan first realized that something was not right when a trafficker ordered the 20-or-so passengers to sneak from the bus to an army truck.  From there, the conditions on what turned out to be a yearslong journey worsened.

Food and water were scarce.  The group often only ate once per day, and there were days when the group was given no food at all.  Mr. Chan often had to drink from puddles or rivers.

There was no shelter. The group was forced to sleep outside on the ground with no blankets or pillows. Other than rinsing themselves in rivers, the group never bathed. On one occasion, several smaller groups that were being trafficked were climbing a mountain. Mr. Chan observed someone from a different group fall off the mountain. When the various groups were later reunited, those being trafficked confirmed that the person who had fallen from the mountain had died. Mr. Chan witnessed people grow ill on the journey, some of whom also died.

At some point, the group entered Thailand, where for the first time in more than two years Mr. Chan lived indoors, in a crowded apartment. Mr. Chan was housed in Bangkok for more than a year. There were roughly 30 to 40 men and women living in the apartment, and Mr. Chan slept on the floor, surrounded by strangers. There was one kitchen and one bathroom, and fights often broke out as people grew impatient with the length of their journeys. From time to time, the traffickers would call individuals' names and take them out of the apartment. Most often, those who left would not return. Mr. Chan presumed that those who were called were taken to the United States. On one occasion, Mr. Chan, who was around 16 years old at the time, was called to leave the apartment. He was brought to a hotel room where one of the female traffickers was staying. This middle-aged woman demanded that Mr. Chan have sex with her. After taking Mr. Chan's virginity, she beat Mr. Chan. From then on, this woman would occasionally remove Mr. Chan from the apartment and force him to perform sex acts on her.

Finally, in March 1994, the traffickers took Mr. Chan to the Bangkok airport and gave him false documentation. Mr. Chan, then just 17 years old, landed at Newark Airport in New Jersey on March 28, 1994.

When Mr. Chan arrived in the United States, he had no money, knew no one in the United States, and spoke no English. From the moment he arrived, Mr. Chan's life was controlled by the

Snakehead organization. After going through Customs, Mr. Chan was picked up by two men, who drove Mr. Chan to an apartment in what he later learned was Brooklyn, New York. After a few days at that apartment, Mr. Chan was ushered into a car and taken to another location in Queens, New York.

Once in Queens, Mr. Chan's life continued to be run by the Snakehead organization, just as it had been since he was 14 years old. To pay off his $35,000 debt, Mr. Chan was forced to work grueling hours in a clothing sweatshop in Flushing. He would arrive at the sweatshop by 6 am and work until 10 pm—16 hours straight, six days a week. The work was menial and difficult. Yun did not receive any money for his work; instead, the traffickers kept any money Yun had earned and provided him with meager food and shelter.

One day, members of the Snakehead organization took Mr. Yun to an expensive dinner, which, in hindsight, Mr. Chan realizes was used to coerce him to join their criminal activity. These men were all older than Mr. Chan, who was just a teenager at the time. The dinner was the first time Mr. Chan ever ate in a restaurant. After the dinner, the group began giving Mr. Chan orders. Mr. Chan—who had just completed a challenging journey through Southeast Asia during which he had not spoken to or heard from anyone in his family for nearly four years—had nowhere to turn or hide. The group preyed on this vulnerability. When they instructed Mr. Chan to no longer report to the factory, he complied with their demands.

The gang exercised control over Mr. Chan. They constantly reminded him that he owed them $35,000. They remained Mr. Chan's only source of food, clothing, and shelter in a foreign country where he knew no one. The leader of the group once threatened Mr. Chan. He said that he knew where Mr. Chan's family lived in China and threatened to murder his family if he tried to run away. Without any other contacts in the United States or money of his own, Mr. Chan

continued to associate with the group.

Mr. Chan cooked and cleaned for the group; he ran to the store to get them food and drinks; and he served at their beck and call.  They gave him a beeper and demanded that he call them immediately after they paged him.  And the group's requirements soon became more dangerous.  For example, Mr. Chan and the other subordinates were instructed to go to the airport to pick up new people from China, much in the same way he had been picked up when he first arrived at Newark Airport.  Mr. Chan was also ordered to go to sweatshops in Queens and pick up envelopes.  Mr. Chan later came to realize that those sealed envelopes contained protection money that the organization had extorted from the business owners, and he was, in fact, ultimately convicted of extortion.

The demands of Mr. Chan escalated quickly.  Within months of Mr. Chan arriving in the United States, the gang had demanded that Mr. Chan help to rob—and ultimately kill—a rival trafficker.  Mr. Chan was convicted of murder, and on January 14, 1997, the Court sentenced him to imprisonment for a term 25-years-to-life, with the possibility of parole.

While incarcerated, Mr. Chan turned his life around.  Starting around 2014, Mr. Chan had embraced Christianity, which helped Mr. Chan connect with his prison community.  He found his mental health and happiness improving through daily prayer.  Mr. Chan was granted parole and released from prison on May 23, 2020.  Upon release, Mr. Chan was taken to the Immigration Customs Enforcement ("ICE") Detention Center in Denver, Colorado, where he was housed until November 13, 2020.  At that time, he was granted an OSUP.

Following his release from ICE custody, Mr. Chan worked with immigration lawyers to attempt to obtain Chinese identification.  China, however, refused to recognize Mr. Chan as a Chinese citizen because he was never registered in the Chinese system.  Since returning to New

York, Mr. Chan has had regular in-person check-ins with ICE, including on January 20, 2021, March 22, 2022, March 23, 2023, April 4, 2023, April 4, 2024, September 9, 2024, and December 4, 2024.

On March 23, 2023, Mr. Chan attended his regular ICE check-in meeting.  During the meeting, an ICE officer asked him for his Chinese passport.  Mr. Chan explained that he does not have a Chinese passport or any other identification from the Chinese government, such as a birth certificate.  The officer required that Mr. Chan submit a completed Chinese passport application to the ICE office by April 4, 2023 and warned Mr. Chan that if he did not comply, ICE would require Mr. Chan to wear an ankle monitor and check-in at the office every day at 8 am.

Mr. Chan visited the Chinese Consulate General on March 27, 2023 to request a passport application, but he was informed that all applications must be submitted online through the "China Consular Affairs" app.  Mr. Chan was unable to submit an application through the app because the "name verification step" required him to provide a Chinese identification number to verify his Chinese citizenship, which Mr. Chan does not have.  Mr. Chan relayed this information to an ICE officer on April 4, 2024, and his next check-in was scheduled.  All the while, Mr. Chan continued to lead a lawful life, working jobs in construction and, most recently, managing a restaurant.

On September 8, 2025, Mr. Chan arrived at ICE's New York Field Office located at 26 Federal Plaza, New York, NY 10278 before 9:00 am.  After nearly three hours of waiting, Mr. Chan was instructed to return the following day to complete his check-in.  As always, Mr. Chan complied with the directives of ICE officers, and on September 9, 2025, he returned, accompanied by Professor Mogulescu of Brooklyn Law School.

ICE's notice for the September 2025 OSUP check-in did not state that Mr. Chan's OSUP would be revoked, nor did it inform Mr. Chan that he would be detained and processed for an

expedited and unnoticed deportation. Yet that is precisely what occurred. Shortly after Mr. Chan arrived for his scheduled check-in, he was ushered into a screening area where Officer De La Cruz asked him three questions: (1) Do you have a criminal conviction? (2) Do you have any applications or petitions pending? and (3) Are you subject to an order of deportation? Mr. Chan answered these questions honestly, stating that he has a criminal conviction, does not have any applications or petitions pending, and is subject to an order of deportation. Officer De La Cruz wrote "CRIM" on Mr. Chan's intake papers and ushered Mr. Chan to the next room, where Officer Melo asked a few additional questions. Soon thereafter, Mr. Chan was informed that he was going to be detained because of his "criminality" and final order of deportation.

Professor Mogulescu asked the officers for additional information about why Mr. Chan was being detained. She explained that he had an OSUP, and she requested that a supervisor provide a further explanation. Eventually Assistant Director Robinson informed Professor Mogulescu of the purported "change in circumstance" that permitted ICE to detain Mr. Chan, notwithstanding his OSUP and lack of due process: that "China is now issuing travel documents." It was—and continues to be—unclear what, if anything, this means.

Indeed, Mr. Chan has been unable to obtain a Chinese passport. In fact, at the direction of ICE on March 23, 2023, Mr. Chan previously tried to obtain a passport through the Consulate General of the People's Republic of China in New York to request an application, but he was advised that he needed to complete a form online. Mr. Chan went to the website (and then the Chinese Consular Affairs mobile application), but the form required him to provide a Chinese identification number. Because Mr. Chan was the fourth-born son, his parents never reported his birth to the Chinese government, which at the time limited how many children a family could have. Accordingly, Mr. Chan did not have the requisite identification number, and he could not complete

his application for a passport.  Mr. Chan relayed this information to ICE on April 4, 2023, at his next scheduled check-in, including by submitting a sworn affidavit from a Mandarin-speaking paralegal.  Fully apprised of Mr. Chan's stateless status, ICE scheduled Mr. Chan for a check-in on September 9, 2025, at which it detained him.

## ARGUMENT

The standards for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure are identical.  To succeed on an application for a temporary restraining order or a motion for preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits, that  he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Geller v. De Blasio*, 613 F. Supp. 3d 742, 746-47 (S.D.N.Y. 2020).

Further, "a federal court always has jurisdiction to determine its own jurisdiction." *Brownback v. King*, 592 U.S. 209, 218 (2021) (quoting *United States v. Ruiz*, 536 U.S. 622, 628 (2002)).  In a *habeas* action, a court may order respondents to preserve the status quo to ensure that the court has the chance to consider whether it has subject-matter jurisdiction, and if so, the merits of the petition.  *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947); *Ozturk v. Hyde*, No. 25-CV-10695, 2025 WL 942731, at *1 (D. Mass. Mar. 28, 2025) ("a federal court retains jurisdiction to maintain the status quo while it determines its subject matter jurisdiction") (citations omitted).  Preservation of the status quo is especially important "where the action the court enjoins would otherwise destroy its jurisdiction or moot the case."  *Ozturk v. Hyde*, No. 25-cv-10965, slip op. at 2 (D. Mass Mar. 25, 2025) (ECF No. 3) (citing *United States v. Shipp*, 203 U.S. 563, 573 (1906)).

A court's power to maintain the status quo and protect its jurisdiction pursuant to the All-

Writs Act, 28 U.S.C. § 1651, is broad. *See Loc. 1814, Intern. Longshoremen's Ass'[n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1237 (2d Cir. 1992) ("Once the district court acquires jurisdiction over the subject matter of, and the parties to, the litigation, 'the All Writs Act [28 U.S.C. § 1651] authorizes a federal court to protect that jurisdiction'") (quoting *United States v. Int'l Bd. of Teamsters*, 907 F.2d 277, 281 (2d Cir.1990)); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*, 523 F. Supp. 2d 328, 335 (S.D.N.Y. 2007) ("'injunctions [under the All–Writs Act] are needed to prevent third parties from thwarting the court's ability to reach and resolve the merits of the federal suit before it'") (quoting *In re Baldwin-United Corp.*, 770 F.2d 328, 339 (2d Cir.1985)). This power can extend to "grant[ing] temporary relief to preserve the status quo pending the ripening of [a] claim [before an administrative tribunal] for judicial action on its merits." *Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 884–85 (2d Cir. 1981).

Indeed, the Court's equitable powers can go so far as to include enjoining a petitioner's removal from the country and/or a court's district. *See, e.g.*, *Garcia-Izquierdo v. Gartner*, No. 04 CIV. 7377, 2004 WL 2093515, at *2 (S.D.N.Y. Sept. 17, 2004) ("Under the All Writs Act, 28 U.S.C. § 1651, the Court may order that a petitioner's deportation be stayed only when a stay is necessary to preserve the Court's jurisdiction of the case.") (citing *Int'l Bd. of Teamsters*, 266 F.3d at 49–50); *see, e.g.*, *M.K. v. Joyce*, No. 25-CV-1935, 2025 WL 750599, at *1 (S.D.N.Y. Mar. 10, 2025) (relying on aforementioned caselaw to enjoin the petitioner's removal from the U.S. "unless and until the Court orders otherwise"); *Suri v. Trump*, No. 1:25-CV-480, 2025 WL 914757, at *1 (E.D. Va. Mar. 20, 2025) (enjoining the removal of the petitioner from the U.S. "unless and until the Court issues a contrary order"); *Mahdawi v. Trump*, No. 2:25-CV-00389, 2025 WL 1099021, at *1 (D. Vt. Apr. 14, 2025) ("In order to preserve this Court's jurisdiction, and pursuant to the All

Writs Act, 28 U.S.C. § 1651, it is ordered that the Petitioner . . . not be removed from the United States or moved out of the territory of the District of Vermont pending further order of this Court.").

### 1.    MR. CHAN IS LIKELY TO SUCCEED ON THE MERITS.

Mr. Chan's detention on September 9, 2025 violated both statutory and constitutional protections because he was re-detained without notice, hearing, or any change in circumstances justifying revocation of his supervision.  As is discussed *supra,* Mr. Chan was detained without any notice or warning on September 9, 2025, when he appeared for an appointment with the Government.  At the time of his detention, Mr. Chan was in full and complete compliance with the OSUP that was granted to him by Respondents.  To be granted the OSUP, Respondents had to determine that Mr. Chan was neither a flight risk nor a danger to the community.  The detention of Mr. Chan on September 9, 2025, without any notice or opportunity to be heard was unlawful.

To comport with due process, detention must bear a reasonable relationship to its two constitutionally-authorized purposes—to ensure the appearance of noncitizens at future hearings and to prevent danger to the community.  *See Zadvydas v. Davis*, 533 U.S. 690, 691 (2001).  Mr. Chan is neither a danger nor a flight risk.  ICE determined that Mr. Chan is neither a flight risk nor a danger when they granted his OSUP on November 13, 2020, and nothing has changed since that time.  Mr. Chan has been in full and complete compliance with the terms of his OSUP and has not violated any local, state or federal laws.  There is no allegation of new misconduct, noncompliance, or public safety concern.  Thus, his re-detention cannot be justified under the purposes of supervision.

Because Mr. Chan's detention on September 9, 2025 has been unaccompanied by the procedural protections that such a significant deprivation of liberty requires his continued detention is unlawful under the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *see also Perry v. Sindermann*,

408 U.S. at 601-03 (1972) (reliance on informal policies and practices may establish a legitimate claim of entitlement to a constitutionally protected interest). Infringing upon a protected interest triggers a right to a hearing before that right is deprived. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70 (1972).

The Government's presumed basis for detaining Mr. Chan is 8 U.S.C. § 1231, the statute governing detention following a final order of removal ("post-order detention"). Under the terms of this statute and the governing regulations, Mr. Chan's detention is unlawful. Specifically, 8 U.S.C. § 1231 authorizes the detention of individuals following a final order of removal only under specifically delineated circumstances. The third subclause of 8 U.S.C. § 1231(a)(3) provides that an individual who is not removed within a 90-day statutory removal period "*shall* be subject to supervision" (emphasis added) under specific terms, including requirements that he or she appear periodically before an immigration officer and obey any written restrictions. *See also* 8 C.F.R. § 241.5 (specific conditions for release—involving but not limited to reporting requirements and travel document acquisition requirements—should an order of supervision be issued). Furthermore, 8 U.S.C. § 1231(a)(7) provides that work authorization can be issued when the removal of an individual is impossible as a result of travel document related issues or "otherwise impracticable or contrary to the public interest." *See also* 8 C.F.R. §§ 241.5(c); 274a.12(c)(18).

To the extent that Respondents have revoked Mr. Chan's OSUP without notice or an opportunity to be heard, they violated the statute and the applicable regulations–8 C.F.R. §§ 241.4(l) and 241.13(i)–by failing to provide him with a particularized notice of the reason(s) of the revocation of his release or an opportunity to respond to the allegations contained therein. When the Government fails to comply with its own federal regulations, as it did when it revoked Mr. Chan's OSUP in violation of its own procedures, the action is invalid. *See Ceesay v.*

11

*Kurzdorfer*, 781 F. Supp. 3d 137,  2025 WL 1284720 at *1 (W.D.N.Y. May 2, 2025) ("As the framers recognized centuries ago, fair process—not just the correct outcome—matters.  After all, without due process, there is no way to tell whether the result is in fact correct."); *Rombot v. Souza,* 296 F. Supp. 3d 383, 388 (D. Mass. 2017) (finding that "[t]he Supreme Court has recognized that an 'alien may no doubt be returned to custody upon a violation of [supervision] conditions,' but it has never given ICE *carte blanche* to re-incarcerate someone without basic due process protection.") (citing *Zadvydas v. Davis*, 533 U.S. 690, 700 (2001); *see also Torres-Jurado v. Biden,* 2023 U.S. Dist. LEXIS 193725 at *12 (S.D.N.Y. Oct. 29, 2023) (stating that "due process, at a minimum" requires the Government to afford meaningful notice and an opportunity to be heard and that the opportunity must be meaningful) (citing to *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 403 (S.D.N.Y. 2004)).

Moreover, under the APA, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review."  5 U.S.C. § 704.  The reviewing Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

The decision to detain Mr. Chan, who had previously been released on an OSUP, and neither violated nor failed to comply with the OSUP, must be reviewed by this Court and found to be "arbitrary, capricious, an abuse of discretion and not in accordance with the law."  5 U.S.C. §§ 706(2)(A), (E).

The INA specifies circumstances upon which a person may be released from custody, and it does not generally provide for re-detention except for a violation of those terms.  The relevant regulatory framework (8 C.F.R. §§ 241.4(l) and 241.13(i)) authorizes revocation of an individual's

release on an OSUP only in certain contexts. Section 241.4(l) specifies revocation may occur upon violation of the conditions of release or when, in the district director's opinion, revocation is in the public interest because one of four conditions is met: "(1) the purposes of release have been served; (2) the alien violates any condition of release; (3) it is appropriate to enforce a removal order or to commence removal proceedings against an alien; or (4) the conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate." 8 C.F.R. § 241.4(l)(2). Section 241.13(i) provides further conditions where release decisions may be revoked, only for the purpose of removal. Notably, several of these provisions are found only in the regulations and not the statute and are ultra-vires, but even to the extent they apply, Respondents have failed to comply with the process.

Under 8 C.F.R. § 241.13(i), Mr. Chan has, at minimum, a right to a detailed explanation for the reasons of revocation as well as an interview to contest the basis for the revocation. At a minimum, ICE "has the duty to follow its own federal regulations." *Haoud v. Ashcroft*, 350 F.3d 201, 205 (1st Cir. 2003) (quoting *Nelson v. I.N.S.*, 232 F.3d 258, 262 (1st Cir. 2000)). It has failed to do so here.

In addition, the Government's actions have also deprived Mr. Chan of due process of law. Procedural due process constrains governmental decisions that deprive individuals of property or liberty interests within the meaning of the Due Process Clause. *See Mathews*, 424 U.S. at 332; *see also Perry*, 408 U.S. at 601-03 (reliance on informal policies and practices may establish a legitimate claim of entitlement to a constitutionally protected interest). Infringing upon a protected interest triggers a right to a hearing before that right is deprived. *See Board of Regents of State Colleges*, 408 U.S. at 569-70.

The revocation of Mr. Chan's release would not satisfy the minimum requirements of due

process, because that revocation is not the product of any individualized review and alleges no relevant change in circumstances altering the original assessment of his risk of flight. *See Sering Ceesay v. Kurzdorfer,* 781 F. Supp. 3d 137, 2025 WL 1284720 at *1 (W.D.N.Y. 2025) ("Noncitizens, even those subject to a final removal order, have constitutional rights just like everyone else in the United States."); *Rombot*, 296 F. Supp. 3d 383 at 388 (finding that "[t]he Supreme Court has recognized that an 'alien may no doubt be returned to custody upon a violation of [supervision] conditions, but it has never given ICE a carte blanche to re-incarcerate someone without basic due process protection.") (citing *Zadvydas*, 533 U.S. at 700); *see also Torres-Jurado v. Biden,* 2023 U.S. Dist. LEXIS 193725 at *12 (S.D.N.Y. Oct. 29, 2023) (stating that "due process, at a minimum" requires the Government to afford meaningful notice and an opportunity to be heard and that the opportunity must be meaningful) (citing to *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 403 (S.D.N.Y. 2004)).

## 2.    MR. CHAN WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A TEMPORARY RESTRAINING ORDER.

Under the four-factor test, "[a] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal citation and quotation marks omitted). Under this prong, a party seeking a TRO "must show that "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the position they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999); *see also Salinger v. Colting*, 607 F.3d 68, 81-82 (2d Cir. 2010). In addition, the harm must be "neither remote nor speculative, but actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (citation omitted).

Here, Mr. Chan satisfies the irreparable harm prong in at least three ways.

First, Mr. Chan's detention is accompanied by alleged violations of the Fifth Amendment's Due Process Clause. His allegations of constitutional violations permit a *per se* finding of irreparable harm. *See e.g.*, *Conn. Dep't of Envtl. Prot. V. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury.") (internal citations and quotation marks omitted); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[An] *alleged* violation of a constitutional right . . . triggers a finding of irreparable harm.") (emphasis in original).

Second, if ICE proceeds with deportation, Mr. Chan will suffer irreparable harm because he is stateless. Mr. Chan was trafficked from rural China as a teenager by criminal smugglers and has lived in the United States for over three decades. Despite his efforts, Mr. Chan does not possess valid citizenship or recognized legal status in any country, nor does he have family support abroad. While Mr. Chan is currently being represented pro bono by a law firm in connection with potentially pursuing post-conviction relief under the Survivors of Trafficking Attaining Relief Together Act, which was amended to allow individuals to move to vacate their criminal convictions where their participation in the underlying offense was a result of having been a victim of labor trafficking, *see* Wiktor Declaration Exhibit 2, he thus far has not obtained United States citizenship. He is hopeful that he will be able to do so in the future. Further, Mr. Chan has unsuccessfully tried to obtain Chinese citizenship as well as a Chinese passport. Deportation under these circumstances would amount to banishment without a destination, leaving Mr. Chan vulnerable to indefinite detention, refoulement, or extrajudicial harm.

Third, absent preliminary relief, no amount of many can put Mr. Chan—who is likely to be deported to a country to which he has little-to-no ties—back in the same position as he was when he woke up on September 9, 2025.

Absent Court intervention, ICE will deport Mr. Chan without providing him an opportunity to contest the revocation of his OSUP.  Once removed, Mr. Chan will be effectively deprived of his ability to challenge his detention and removal in this Court.  Such removal would moot his habeas petition and forever extinguish his constitutional and statutory claims.

For these reasons, Mr. Chan satisfies the irreparable harm prong.

### 3.    THE EQUITIES HEAVILY FAVOR MR. CHAN.

As between Mr. Chan and the Government, there can be no reasonable dispute that the equities heavily favor Mr. Chan, whose liberty is at stake.  On the one hand, at the time of his illegal detention Mr. Chan was complying with the OSUP, managing a restaurant full time, and otherwise leading a law-abiding life.  He was also working with a well-known law firm to have his conviction expunged in furtherance of his goal to one day become a United States citizen.  *See* Wiktor Declaration, Exhibit 2 (letter from Cravath Swaine & Moore LLP).  On the other hand, Mr. Chan has credibly alleged that the Government has violated his Constitutional rights, the consequences of which could have a life-altering effect.

### 4.    A TRO WOULD NOT MEANINGFULLY HARM THE GOVERNMENT OR PUBLIC INTEREST.

Finally, the Court should grant Mr. Chan's application because a TRO would not significantly impede the Government or public interest. In inquiries concerning the Government's efforts to remove a noncitizen, the Government and public interest factors merge as the Government is both the opposing litigant and public interest representative.  *See Nken*, 556 U.S. at 435.  At the time of his unnoticed detention, Mr. Chan was in full and complete compliance with the terms of his OSUP.  Mr. Chan was released on an OSUP after finding that he was not a danger or a flight risk, and he has fully abided by the terms of his release.

Here, temporarily restraining Respondents from effectuating Mr. Chan's removal would

not harm the Government's interests because the requested relief is temporary, narrowly tailored, and will only last pending the instant motion. Mr. Chan simply asks the Court to restore the status quo that was in effect for the past approximately five years. Rather, an order for the maintenance of the status quo may simply "enable Respondents[-Defendants] to fully brief the Petition without the time pressure of a looming removal date." *S.N.C. v. Sessions*, 325 F. Supp. 3d 401, 412 (S.D.N.Y. 2018).

## CONCLUSION

Mr. Chan respectfully requests that the Court grant his motion for a temporary restraining order and maintain the status quo until this Court has an opportunity to assess his underlying Petition.

Dated: September 9, 2025               Respectfully submitted,
      New York, New York

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By: */s/ David Oliwenstein*
David Oliwenstein
Andrew Wiktor
Catherine Perez
Fangwei Wang
31 West 52nd Street
New York, NY 10019-6131
Tel.: (212) 858-1000
Fax.: (212) 858-1500
david.oliwenstein@pillsburylaw.com
andrew.wiktor@pillsburylaw.com
catherine.perez@pillsburylaw.com
fangwei.wang@pillsburylaw.com

*Attorneys for Plaintiff-Petitioner Yun Chan*

17

## WORD CERTIFICATION

I hereby certify that the word count of this memorandum of law complies with the word limits of Rule 7.1 of the Local Rules of the United States District courts for the Southern and Eastern District of New York. According to the word-processing system used to prepare this memorandum of law, the total word count is 5,533 words.

Dated: September 9, 2025          Respectfully submitted,
      New York, New York

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By: */s/ David Oliwenstein*
David Oliwenstein
Andrew Wiktor
Catherine Perez
Fangwei Wang
31 West 52nd Street
New York, NY 10019-6131
Tel.: (212) 858-1000
Fax.: (212) 858-1500
david.oliwenstein@pillsburylaw.com
andrew.wiktor@pillsburylaw.com
catherine.perez@pillsburylaw.com
fangwei.wang@pillsburylaw.com

*Attorneys for Plaintiff-Petitioner Yun Chan*